Filed 8/13/14  P. v. Rustrian CA1/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>ERIC ORLANDO RUSTRIAN,<br><br>        Defendant and Appellant. | A139500<br><br>(San Mateo County Sup. Ct.<br> No. SC076776A) |

Defendant Eric Orlando Rustrian appeals from a judgment of conviction for possession for sale of marijuana.  He contends the trial court erred in denying his motion to suppress evidence obtained from the warrantless, forced entry by Daly City police into his Daly City, California home because that entry and the subsequent search, in which police discovered about 100 marijuana plants, violated his Fourth Amendment rights against unreasonable searches and seizures.

On the day in question, the Daly City Police Department was alerted by a 911 dispatcher for the San Francisco Police Department that a mobile phone call had just been received from a woman who appeared to be under attack in a domestic violence incident, the mobile phone call had ended abruptly, and the woman's mobile telephone company listed her registration address as being in Daly City.  The Daly City police dispatched to this address, which proved to be defendant's home, made some efforts, but were unable to obtain any other information indicating the woman lived or was present there, and found no indications anyone was inside the home during 20 minutes of investigation and

1

observation. Upon their entry and search, they found no person was present. Based upon these facts, we conclude the People did not meet their burden of establishing the reasonableness of the forced entry. Therefore, we reverse the judgment.

## BACKGROUND

In October 2012, the San Mateo County District Attorney filed a three-count information charging defendant with the cultivation of marijuana (Health & Saf. Code, § 11358); possession for sale of marijuana (Health & Saf. Code, § 11359); and stealing utility services belonging to PG&E (Pen. Code, § 498, subd. (d)). Defendant pled not guilty to all three counts.

Subsequently, defendant moved pursuant to Penal Code section 1538 to suppress evidence obtained by police as a result of their warrantless search of his home. The facts presented at the suppression hearing are not disputed.

At 11:38 a.m. on January 18, 2012, a mobile phone call[1] from a 707 area code was received on the 911 line of the San Francisco Police Department. According to the testimony of the police custodian of records, the 911 dispatcher taking the call heard "some kind of physical altercation between a male and a female." The female was screaming, " 'let me go.' " The male said, " 'You set me up,' " whereupon the call was disconnected.

The 911 dispatcher traced the call to T-Mobile. She contacted T-Mobile and was told the subscriber was named Chastity R. Thompson, "who lived at or the account was set up" at a Daly City address. Upon cross-examination, the custodian answered affirmatively when asked if the address was "the billing address" for Thompson. At 11:45 a.m., the 911 dispatcher notified the Daly City police and asked them to conduct a "well-being" check at the Daly City address.

Officer Shane Hart of the Daly City Police Department testified that he was dispatched to the address at about 11:45 a.m. and arrived there about five minutes later.

---

[1] In the record and briefs of the parties, the phone involved here is variously referred to as a "cell phone," "wireless phone," and "mobile phone." We use "mobile phone" because it is the term that was favored by the trial court.

2

He knew that the San Francisco Police Department had received a 911 call from a mobile phone, in which a female voice was heard to say, " '[d]on't hit me' " and " '[t]ake your hands off me,' " and that it sounded from the call like a domestic incident was occurring. He was able to access all the information the dispatcher had through a computer in his car.

At the Daly City address, to which three officers and a sergeant in total were dispatched, Hart observed a two-story house. There were no cars parked in front of it or in the garage. The front entrance was on the second floor of the house. Hart knocked on the front door. The officers looked through the one window of the house available to them, which was on the second floor, as well as in the backyard and through a mail slot on the garage door. They did not hear any sounds coming from inside the house, but Hart saw two dogs in cages in the garage. However, there remained large portions of the house into which they could not see. They had the dispatch center place several calls to the mobile phone number and Hart also called it, but the calls went to voice mail. Hart considered the fact that the phone number had a "707" area code, but it was not enough for him to rule out that he was not at the "right house." Hart also had the dispatch center do a "premise history check" to "find any other associated names to that address." The check did not yield any verifying or additional information, however.

After being at the house for about 20 minutes waiting for the sergeant to arrive, Hart "was not positive that the house was empty." The sergeant made the decision to forcibly enter the house. According to Hart, he, another officer, and the sergeant did so because the 911 call indicated that a possible physical domestic violence incident was occurring and the phone number for the call was registered to a subscriber with this Daly City address. One of the officers kicked in the front door. All three entered the house and conducted a "protective sweep" of the entire house, their weapons drawn, both for officer safety purposes and to see if anyone inside was hurt, wounded, or needed medical attention.

The officers did not find anyone on the second level of the house. They went down an interior stairway into a garage on the lower level, where the two dogs were

3

caged. Hart saw closet doors in the garage and opened them because he thought someone could fit in the closet. He found a locked door directly behind the closet doors that appeared to lead to a separate room. Hart forced entry through the locked door, and found a separate room that was approximately 10 feet by 25 feet in size. He observed approximately 100 marijuana plants and harvesting materials in the room, and believed this was "a grow operation." After a few minutes, he left the room. Another officer took some photographs and the officers left the residence without touching anything.

Hart contacted a narcotics task force, which arrived about an hour later. A search warrant was obtained. Evidence was later seized pursuant to the warrant.

Prior to the task force arriving, defendant arrived at the house and indicated that he lived there. He told Hart that Chastity Thompson, the T-Mobile subscriber, had moved to Vallejo.

Defendant argued in his motion to suppress that the officers violated his Fourth Amendment rights against search and seizure. As stipulated by the parties at the hearing, the motion challenged "the entry to the home in the first instance and everything that led up to the securing of the warrant."

At the hearing, defense counsel argued that the officers, at the time they entered the house, did not have probable cause to believe either that there was a victim in the residence or that they were in danger, nor a reasonable belief that they could find the victim of the possible domestic violence incident heard on the 911 call at that location and at that time. Between the time of the 911 call and their entry, the officers had observed the house for 20 minutes. They heard no sounds coming from inside it and saw no one coming or going. Under these circumstances, that they had an address associated with the mobile phone number "[did] not provide the necessary information to go and search a specific address without more." The officer could have remained outside the house and conducted further investigation to determine the location of the woman heard in the 911 call. Indeed, counsel argued, after the 20 minutes of investigation by police, the probability there was anyone inside the house had been reduced, given the lack of

4

further calls, any auditory or visual information, or the presence of cars indicating there was anyone in the house.

The court asked defense counsel to consider whether there could have been an assailant inside the home who had secured himself and the victim in an interior room in the garage and silenced the victim so that they could not have been heard. Defense counsel responded that the mobile phone call did not provide a sufficient nexus between the woman in distress and the location for the officers to reasonably believe that the phone call emanated from the home.

The People opposed the motion. They argued in their papers that the officers' forcible entry and warrantless search was justified by the exigent circumstances, based on what the 911 dispatcher heard occurring on the wireless call, as well as the officers' right to conduct a protective sweep of the home to determine if there were any assailants or injured persons there. Since the marijuana plants were found in plain view in the course of this lawful sweep, the evidence should not be suppressed.

At the hearing, the prosecutor argued that the officers had done everything they could to try to confirm the location of the woman in distress and, left with the information they had, acted reasonably to enter the home, which was the only information they had of the woman's possible location. The officers "would have been derelict in their duties, had they gone to the house, said well, looks like nobody's home, maybe we should get a search warrant to see if we can get in the house. That defeats the whole premises of what exigent circumstances are."

The trial court denied defendant's motion to suppress. It noted that an officer was at the premises five minutes after the original 911 call, demonstrating the seriousness of the exigency presented to the Daly City Police Department. Once there, the officers made reasonable efforts to try to determine a nexus between the 911 caller and the premises in addition to the information they already had, but their investigation neither confirmed nor dispelled the reasonable suspicions that had brought them to the Daly City address in the first place. The court found "that their actions were, in fact, reasonable based on the information and the totality of the circumstances presented to them at the

5

time, to wit, a woman clearly in distress and being physically assaulted and attempting to curtail the assault first by, apparently, pleading with her attacker and secondarily by seeking the assistance of the police and then the abruptness of the call being dropped, suggesting that her resistance was, in fact, overcome, that I think these officers acted swiftly and appropriately under the circumstances." Citing *Tamborino v. Superior Court* (1986) 41 Cal.3d 919 (*Tamborino*), the court further stated that it was "not going to second guess the actions of officers in the field, when asked to come to the aid of someone who's either injured or under attack. So I think the conduct was reasonable under the circumstances, that there was an exigency that they responded to."

The court made clear it considered the matter "a very, very close case." On the one hand, the officers "had information that led them to believe that somebody may be present and injured and in distress in that residence. On the other hand, the court had "a concern that the only information [the police] have is the registration address of the cell phone and the . . . call comes in over a cell phone. And, I think that the operative question is whether that by itself, cause that's, essentially, what they have, authorizes the entry into the home." The court noted that other cases, such as *Tamborino*, involved evidence of a mobile phone call *and* somebody being present at the location.

Subsequently, defendant withdrew his plea of not guilty to count 2 of the information, possession for sale of marijuana (Health & Saf. Code, § 11359) and entered a plea of no contest. The remaining two counts were dismissed. At sentencing, the court placed defendant on probation for three years, subject to various terms and conditions, including that he serve 90 days in the county jail and abstain from the use of alcohol and controlled substances.

Defendant filed a timely notice of appeal.

## DISCUSSION

### A. *Legal Standards*

"In reviewing a trial court's ruling on a motion to suppress evidence, we defer to that court's factual findings, express or implied, if they are supported by substantial

6

evidence. [Citation.] We exercise our independent judgment in determining whether, on the facts presented, the search or seizure was reasonable under the Fourth Amendment." (*People v. Lenart* (2004) 32 Cal.4th 1107, 1119.)

Given that the facts here are not disputed, we focus on the law regarding the search of a person's home and seizure of evidence found there. The Fourth Amendment protects individuals against unreasonable searches and seizures. (U.S. Const., 4th Amend.; *Elkins v. United States* (1960) 364 U.S. 206, 222.) Its "touchstone" is "reasonableness," determined " 'by assessing, on the one hand, the degree to which [the search or seizure] intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.' " (*United States v. Knights* (2001) 534 U.S. 112, 118-119.)

The Supreme Court noted earlier this year that, "when it comes to the Fourth Amendment, the home is first among equals." (*Florida v. Jardines* (2013) ___ U.S. ___ [133 S.Ct. 1409, 1414].) "It is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed.' [Citation.] And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest." (*Welsh v. Wisconsin* (1984) 466 U.S. 740, 748 (*Welsh*).) Thus, the Supreme Court has recognized, "as 'a "basic principle of Fourth Amendment law[,]" that searches and seizures inside a home without a warrant are presumptively unreasonable.' " (*Ibid*., quoting *Payton v. New York* (1980) 445 U.S. 573, 586.)

The presumption of unreasonableness will stand "unless the police can show that [the search or seizure] falls within one of a carefully defined set of exceptions based on the presence of 'exigent circumstances.' " (*Coolidge v. New Hampshire* (1971) 403 U.S. 443, 474-475.) Our Supreme Court has defined "exigent circumstances" as " ' "an emergency situation requiring swift action to prevent imminent danger to life or serious damage to property, or to forestall the imminent escape of a suspect or destruction of evidence. There is no ready litmus test for determining whether such circumstances

7

exist, and in each case the claim of an extraordinary situation must be measured by the facts known to the officers." ' " (*People v. Panah* (2005) 35 Cal.4th 395, 465.) United States Supreme Court decisions "have emphasized that exceptions to the warrant requirement are 'few in number and carefully delineated,' [citation], and that the police bear a heavy burden when attempting to demonstrate an urgent need that might justify warrantless searches or arrests." (*Welsh*, *supra*, 466 U.S. at pp. 749-750.)

The People cite a Ninth Circuit case in which another, related exception is discussed, referred to as the "emergency doctrine." The court applied it to a circumstance in which a possible domestic violence victim had already left the premises and there was no reason to believe evidence of a crime would be found in the residence, but the person who appeared to have perpetrated the violence remained inside and there was a concern that he would hurt himself. (*United States v. Martinez* (9th Cir. 2005) 406 F.3d 1160, 1163-1164 (*Martinez*).) The court defined this doctrine as containing three requirements: "(1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property[;] (2) The search must not be primarily motivated by intent to arrest and seize evidence[; and] (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched." (*Id*. at p. 1164.)

The *Martinez* court pointed out that "[t]he volatility of situations involving domestic violence make them particularly well-suited for an application of the emergency doctrine." (*Martinez*, *supra*, 406 F.3d at p. 1164.) The court observed, " 'Courts have recognized the combustible nature of domestic disputes, and have accorded great latitude to an officer's belief that warrantless entry was justified by exigent circumstances when the officer had substantial reason to believe that one of the parties to the dispute was in danger.' " (*Id*. at p. 1165, quoting *Tierney v. Davidson* (2d Cir. 1998) 133 F.3d 189, 197.)

**B. *Analysis***

We agree with the trial court that this case involves a very close call. The question is whether the People met their burden of proving that the Daly City police were

reasonable in their warrantless, forcible entry and search of a residence under the circumstances of this case. We conclude the police were not reasonable in doing so.

Our analysis begins with the understanding that the People bear the "heavy burden" of proving that the police entry and search was reasonable, particularly because the residence was defendant's home. (*Welsh*, *supra*, 466 U.S. at pp. 748-749; *Florida v. Jardines*, *supra*, 133 S.Ct. at p. 1414.) The facts presented by the People are clear. At the time of their forcible entry, the Daly City police officers knew that (1) a mobile phone call was received by the 911 line of the San Francisco Police Department from a woman apparently being physically assaulted by a man before the call abruptly ended; (2) no one answered calls to the mobile phone number despite repeated calls; (3) T-Mobile records indicated the number was registered to a female subscriber, Thompson, with a Daly City address listed as her registration address; (4) a residence was located at the Daly City address; and (5) during 20 minutes of efforts by police dispatched to the residence, they heard and saw nothing to indicate anyone other than two dogs were inside that residence, or that it was Thompson's home. Their investigative efforts were observing the residence, knocking on the front door, looking through a front window, looking in the backyard, looking into a mail slot in the garage, calling the mobile phone number, and running a premises history check. The officers heard no sounds coming from inside the house and saw no cars parked in front of the residence or in its garage.

We applaud the police acting expeditiously in response to a possible domestic violence event and with deliberation before entering the Daly City residence, given the Fourth Amendment prohibition against unreasonable search and seizure. However, we would be remiss if we did not point out three critical factors in our analysis of the circumstances. First, the police never established that the Daly City address was Thompson's home. Indeed, the custodian of records who testified on behalf of the People agreed that T-Mobile had provided a billing address only.

9

Second, the officers' observations at the scene during the 20 minutes before they entered the premises provided no indications that anyone was present in the residence, or that the call had been placed from that residence.

Third, we cannot agree that the police did *everything* reasonably possible to determine whether Thompson lived at or anyone was in the Daly City residence. For example, there is no indication that any of the four officers at the scene canvassed neighboring homes to ask who lived at the residence or had been seen there that morning. Also, although a premises history check was done, the record does not indicate the police checked any public records regarding *Thompson* to determine if she listed the Daly City address as a residence.[2]

The People cite several cases for the reasonableness of the officers' forced entry (as opposed to the officers' subsequent conduct inside the residence). They are *Brigham City v. Stuart* (2006) 547 U.S. 398, 403; *People v. Troyer* (2011) 51 Cal.4th 599, 607; *Tamborino*, *supra*, 41 Cal.3d at page 923; and, regarding the emergency doctrine, *Martinez*, *supra*, 406 F.3d at page 1164. In each of these cases, the police had reason to believe that someone was present at the address to which they were dispatched. (*Brigham City v. Stuart*, *supra*, 547 U.S. at pp. 400-401 [police heard shouting from inside, observed juveniles drinking in the backyard, and, upon entering the backyard, saw an altercation taking place inside the home]; *People v. Troyer*, *supra*, 51 Cal.4th at p. 603 [police, dispatched to a location where shots were heard, observed first aid being administered to a victim on the porch and blood on the front door]; *Tamborino*, *supra*, 41 Cal.3d at pp. 921-922 [police dispatched to an address

---

[2] The custodian of records testified that the 911 dispatcher's report indicated the call was traced to a T-Mobile cell tower in southwest San Francisco, but the trial court did not include this in its analysis because there was no indication the police at the scene were aware of this. There also is no indication in the record whether the police had the technological ability to obtain any Global Positioning System Information (GPS) regarding the location of the phone. If they did, it would have been reasonable to pursue this information as well.

where a robbery was reported, observed blood spots outside the building and on the walkway to the subject residence, received confirmation from a neighbor that an injured person was inside, and heard sounds of movement inside the residence]; *Martinez*, *supra*, 406 F.3d at pp. 1162-1163 [police dispatched to a residence in response to a domestic violence call recognized the address as the residence of a previous domestic violence incident, observed a woman upset and crying in the front yard, and heard angry, hostile yelling from inside the house].)  No such evidence existed here, making these cases inapposite.

In the absence of any evidence establishing that Thompson currently lived or anyone was present on the morning in question at this residence, and because not all reasonable efforts were taken to determine these matters, we conclude the People did not meet their heavy burden of establishing the reasonableness of the forced entry and subsequent search of defendant's home.  The call to the 911 line established the existence of exigent circumstances.  However, it did very little to establish *where* these exigent circumstances were located.  The police forcibly entered defendant's home with more questions than answers when they could have reasonably investigated further before making a decision that implicated " 'the chief evil against which the wording of the Fourth Amendment is directed.' "  (*Welsh*, *supra*, 466 U.S. at p. 748.)

Given our conclusion, we do not address defendant's contention that the trial court improperly imposed as a condition of probation that he abstain from the use of alcohol.

**DISPOSITION**

The judgment is reversed.  This matter is remanded to the trial court for proceedings consistent with this opinion.

_____
Brick, J.*

We concur:

_____
Kline, P.J.

_____
Richman, J.

* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

12